IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:                              )
                                    )        Chapter 7
JEFF GOURLEY,                       )
SUSAN GOURLEY,                      )
                                    )        Bankruptcy No. 15-00076
        Debtors.                    )

## RULING ON MOTION TO DISMISS FOR ABUSE

This matter came before the Court for an evidentiary hearing on December 3, 2015 in Dubuque, Iowa. Robert J. Murphy appeared for Debtors Jeff and Susan Gourley ("Debtors"). John Schmillen appeared for the United States Trustee ("UST"). After hearing evidence and arguments, the Court took the matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## STATEMENT OF THE CASE

The UST moves to dismiss Debtors' case for abuse. The UST alleges that the totality of the circumstances demonstrates that a discharge in this case would be an abuse of Chapter 7. The UST argues that Debtors' income is higher than reported on Schedule I. The UST calculates, using Debtors' true income, that Debtors have disposable income. The UST also argues that, with some belt-tightening, Debtors can find more disposable income to support meaningful repayment under a Chapter 13 plan.

Debtors resist.  Debtors argue that they have no disposable income due to

ongoing unexpected expenses.  Debtors argue that they have tightened their belts

by no longer running up debt like they were pre-bankruptcy.

The Court finds that the totality of the circumstances demonstrates abuse and

will dismiss the case unless Debtors file a motion to covert to Chapter 13 within 21

days of this order.

## BACKGROUND AND FINDINGS OF FACT

Debtors filed their Chapter 7 petition on January 22, 2015.  As a part of their

petition, Debtors filed Schedules I and J.  Schedule I sets forth Debtors' income.

Schedule J sets forth Debtors' expenses.  Schedule I shows that Debtors' combined

monthly income after deductions is $5,874.91.  Schedule J shows that Debtors'

monthly expenses total $5,714.93.  Thus, Debtors' monthly disposable income as

reflected on their original petition was $159.98.  Debtors stated on their schedules

that they did not anticipate changes in income or expenses during the year after

filing.

On May 5, 2015, the UST filed the Motion to Dismiss for Abuse.  Attached

to that Motion was a summary of Debtors' income based on their payment advices.

This summary showed that Debtors' combined net monthly income was more than

reported on Schedule I.  Using this new income figure and Debtors' Schedule J, the

UST argued that Debtors' monthly disposable income was enough to support

2

substantial payments to creditors under a Chapter 13 plan.  The UST also noted that Debtors had reaffirmed a debt secured by a camper, on which Debtors were making payments of $266 a month.  The UST argued that this was retention of an unnecessary, if not luxury, item and was further grounds for dismissal.

Debtors resisted the motion.  Debtors argued that their monthly expenses were actually higher than they had initially reported in Schedule J.  Debtors then filed their Amended Schedule J.  According to Amended Schedule J, Debtors monthly expenses total $7,390.57 a month.

Although Debtors asserted in their resistance that the UST incorrectly calculated their income, Debtors did not address this issue at the hearing.  Jennifer Cline, a paralegal specialist at the UST's office, testified that, based on Debtors' payment advises, Debtors' net income was $7,685.10.  Debtors presented no evidence or argument about why this was wrong.  In fact, Mrs. Gourley testified that she had no reason to think that the payment advices, on which Ms. Cline based her calculations, were inaccurate.  Mrs. Gourley also testified that both Debtors have stable jobs.  Mr. Gourley has worked as a sales executive at Woodward Communications for 7 years.  Mrs. Gourley has worked as nursing director for Tri-State Surgery Center for 13 years.

After reviewing the UST calculation of Debtors income, the Court finds that it is accurate based on Debtors' payment advices.  Although Debtors have not amended Schedule I, the Court finds that their net income is $7,685.10.

Ms. Cline also testified about her review of Debtors' expense schedules. Ms. Cline testified that the line items for life and health insurance on Amended Schedule J appeared to be duplicates of paycheck deductions for life and health insurance.  Debtors' Amended Schedule J has a line item of $37.20 for life insurance.  Debtors' payment advices show a $35.10 deduction from Mr. Gourley's paycheck and a $6.00 deduction from Mrs. Gourley's paycheck for life insurance.  Debtors' Amended Schedule J also has a line item of $307.00 for health insurance.  Mrs. Gourley's payment advices show deductions for health insurance totaling $308.82.  Mrs. Cline testified that, although the dollar amounts were not exactly the same, the Amended Schedule J line items for life and health insurance appeared to be duplicates of the deductions.  Debtors did not testify about or otherwise address this issue.

Mr. Gourley testified about Debtors' expenses.  He stated that Debtors' original Schedule J was inaccurate because it underreported their spending.  He testified that Debtors Amended Schedule J was based on a review of their actual spending over the last 6 months to a year.  He also testified that Debtors had many "unexpected" past and future expenses that were not accounted for in Amended

4

Schedule J.  In particular, Mr. Gourley testified that expenses for their children's braces, their children's school lunch program, and vehicle and home repairs were not accounted for in Amended Schedule J.

Debtors have three children.  Debtors' daughter has braces.  Mr. Gourley testified that Debtors have been paying for her braces out of pocket because her braces are not covered by insurance.  During the course of the bankruptcy, there have been seven charges of $150 for her braces.  The last charge was July 1, 2015.  Averaged out over the course of 2015, her braces cost $87.50 a month.  Debtors' Amended Schedule J has a line item of $225 a month for out-of-pocket medical and dental expenses.  Mr. Gourley testified that the braces were not covered by this $225 a month.  Mr. Gourley testified that this $225 a month was entirely used up by visits to doctors and physical therapists and medication costs.  After further examination, however, Mr. Gourley testified that Debtors have actually been paying for her braces with their Flexible Spending Account, which is funded through regular deductions from Mrs. Gourley's paycheck.  Mr. Gourley testified that their son will likely need braces as well.  Mr. Gourley estimates, based on the cost of his daughter's braces, that this will cost around $5,000.  Based on Debtors' exhibits, this cost would probably be spread over at least five years.

Mr. Gourley testified that Debtors also have expenses related to their children's school lunch program.  An exhibit provided by Debtors indicates that

the school lunch program costs Debtors $150 a month.  Debtors' Amended

Schedule J has a line item for $350 a month for Childcare/Education expenses.

Mr. Gourley testified that this $350 did not cover the cost of the school lunch

program.  Mr. Gourley testified that this $350 a month was used up entirely by

summer education expenses and "other expenses for getting them prepared for

school."

Mr. Gourley testified that Debtors have had unexpected vehicle repair

expenses.  Mr. Gourley testified that both of Debtors' vehicles have required and

will continue to require costly repairs.  On Debtors' Amended Schedule J, there is

a $500 line item for transportation.  Mr. Gourley testified that this line item does

not help cover Debtors' vehicle repairs.  Mr. Gourley testified that the $500

monthly expense for transportation is used up entirely by fuel cost.  He testified

that he drives a vehicle that gets 18–20 MPG.  He testified that he commutes 60

miles a day round trip.  He also regularly travels to St. Louis, Chicago, and

northern Wisconsin to service clients for work.  When traveling for work, Mr.

Gourley drives his own vehicle and is reimbursed $0.38 a mile.  Mr. Gourley

asserted that this reimbursement does not cover his actual cost for this travel.

Mr. Gourley testified that Debtors' suffered an unexpected expense earlier

this year when they had to replace the water heater in their home.  Mr. Gourley

6

testified that this cost $1,108.  Debtors' Amended Schedule J has a line item for $300 a month for "Home maintenance, repair, and upkeep expenses."

Debtors' original Schedule J had an $80 line item for "Recreation, clubs, entertainment" expenses.  Debtors' Amended Schedule J increased this line item to $350 per month for these expenses.  Mr. Gourley testified that this accurately reflected his family's spending on recreation.

Debtors' Amended Schedule J added a line item for $200 a month for youth sports.  Mr. Gourley testified that this was an average monthly expense on a year-round basis.  He also testified that, after reviewing their spending, this was Debtors' actual cost.

Debtors' original Schedule J also had a $100 line item for "Miscellaneous" expenses.  Debtors' Amended Schedule J increased this line item to $300 per month.  Mr. Gourley testified that this $300 a month covered household items like laundry detergent.

Debtors' original Schedule J, and their Amended Schedule J, both have a $266 line item for a camper payment and $20 for camper insurance.  Mr. Gourley testified that Debtors have been making payments on the camper because they want to maintain a good relationship with Dupaco Credit Union, their primary lender.  Debtors have tried to sell the camper, but have been unable to find a buyer.  Dupaco Credit Union told Debtors that if they did not reaffirm, Debtors would be

unable to get future financing from Dupaco. Debtors anticipate needing new

vehicles and believe that, without Dupaco, it would be difficult to secure financing

for new vehicles post-bankruptcy. Debtors reaffirmed the camper only to keep

their credit at Dupaco. Debtors have never missed a camper payment.

Debtors' original Schedule J had two line items for car payments—one for

$300 a month and one for $315 a month. Debtors increased these line items to

$485 a month and $348 a month, respectively, on their Amended Schedule J. Mr.

Gourley testified that the increase from $300 to $485 a month was because, in late

December, 2014, he purchased a 2010 Chevy Silverado to replace his 2004 Chevy

Silverado. He also testified that the $343 monthly payment was for Mrs. Gourley's

vehicle.

Mr. Gourley testified that Debtors have no disposable income. He testified

that Debtors have not accumulated any savings during the course of the

bankruptcy. He testified that he did not anticipate being able to save money

anytime soon. He testified that Debtors have been "trying to keep everything as

tight as possible."

## CONCLUSIONS OF LAW

The Bankruptcy Code provides:

> After notice and a hearing, the court, on its own motion or on a
> motion by the United States trustee, trustee (or bankruptcy
> administrator, if any), or any party in interest, may dismiss a case filed
> by an individual debtor under this chapter whose debts are primarily

consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1) (2012).  Depending on a debtor's financial situation and other factors, a presumption of abuse may arise under what is often called the "means test."  Id. § 707(b)(2); McCarty v. Lasowski (In re Lasowski), 575 F.3d 815, 818 (8th Cir. 2009) ("Section 707(b)(2), commonly known as the 'means test,' sets out a structured method of calculating reasonably necessary expenses that is designed to reduce the discretion of bankruptcy courts and to ensure that debtors pay more to their unsecured creditors.").  If the presumption of abuse does not arise under the means test, then the Court may consider whether the case was filed in bad faith or whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."  11 U.S.C. § 707(b)(3).

Here, the UST does not argue that the presumption of abuse applies or that Debtors have filed in bad faith.  Instead, the UST argues that § 707(b)(3) applies because the totality of the circumstances demonstrates abuse.  Under § 707(b)(3) "[a] debtor's actual ability to pay is an important, if not primary, consideration." In re Budig, 387 B.R. 12, 16 (Bankr. N.D. Iowa 2008).  In the Eighth Circuit, "ability to pay, standing alone, constitutes abuse under the totality of the circumstances."  In re Williams, No. 10-03620-ALS7, 2011 WL 10468090, at *3

9

(Bankr. S.D. Iowa July 14, 2011) (citing United States Trustee v. Harris, 960 F.2d

74, 76 (8th Cir. 1994)).  Other factors, however, are also relevant, such as

> whether the bankruptcy filing was precipitated by an unforseen
> catastrophic event, such as a sudden illness or unemployment;
> whether the debtor is eligible for relief under another chapter; whether
> there are non-bankruptcy remedies available to the debtor; whether
> the debtor can obtain relief through private negotiations; whether the
> debtor's proposed budget is excessive or unreasonable; whether the
> debtor has a stable source of future income; whether the debtor could
> provide a meaningful distribution in a Chapter 13 case; and whether
> the debtors' expenses could be reduced significantly without
> depriving them and their dependents of necessities.

In re Honkomp, 416 B.R. 647, 649–50 (Bankr. N.D. Iowa 2009) (quoting In re

Newman, 2008 WL 2228746, at *2 (Bankr. D. Neb. May 29, 2008) and citing In re

Campbell, 2007 WL 1376226, at *4 (Bankr. N.D. Iowa May 7, 2007)).  This last

factor summarizes the expectation that debtors will eliminate unnecessary and

unreasonable expenses—often referred to as "belt-tightening."  e.g., In re Floyd,

534 B.R. 729, 738 (Bankr. N.D. Ohio 2015) ("Debtor enjoys a stable source of

future income and can further reduce her expenses through belt tightening without

deprivation of reasonable expenses for food, shelter, clothing, and other

necessities.").  Belt-tightening not only reveals additional disposable income to pay

creditors, but also ensures that the bankruptcy process does not allow debtors

seeking an unfair "'head start' . . . to preserve a comfortable standard of living at

the expense of their creditors."  In re Lombardo, 370 B.R. 506, 511 (Bankr.

E.D.N.Y. 2007); see also In re Schwartz, 532 B.R. 710, 715 (Bankr. N.D. Ill. 2015)

aff'd, 799 F.3d 760 (7th Cir. 2015) ("It would be unfair to grant [debtors] the

benefit of a Chapter 7 discharge without any impact on their lifestyle."); In re

Hayes, No. 13-80035-G3-7, 2015 WL 236275, at *6 (Bankr. S.D. Tex. Jan. 16,

2015) ("Chapter 7 debtors are expected to do some financial belt tightening and

may be required to forgo amenities to which they had been accustomed."); In re

McClellan, 428 B.R. 737, 744 (Bankr. N.D. Ohio 2009) (same).

## ANALYSIS

The UST argues that Debtors have sufficient disposable income to make

meaningful payments under a Chapter 13 plan.  The UST argues that some of

Debtors' expenses are not reasonable and necessary.  The UST argues that,

although Debtors may spend everything they make, Debtors are required to tighten

their belts in an effort to pay their creditors.  The UST concludes that there is

enough disposable income to support meaningful payments on Debtors'

$58,434.47 in unsecured debt.

Debtors take the opposite view.  They argue that they have no disposable

income or ability to pay.  They argue that a number of expenses are not accounted

for in their Amended Schedule J.  Debtors argue that these expenses reduce their

disposable income to zero.  Debtors argue that all of their expenses are reasonable

and necessary.  Debtors argue that they have tightened their belts by ceasing their

accumulation of debt.

11

As noted, the UST argues that this case is abusive under § 707(b)(3)'s "totality of the circumstances" provision.  Debtors' ability to pay—measured by disposable income—is the primary factor.  Other factors, which this Court identified in <u>Honkomp</u>, are also relevant here.  In particular, the requirement that debtors tighten their belts applies to this case.  The Court addresses those factors as follows.

## I.    Available Disposable Income and Ability to Pay

The UST argues that Debtors have the ability to pay creditors under Chapter 13 and allowing them to proceed under Chapter 7 would be an abuse of the bankruptcy process.  The UST argues that Schedule I underreports Debtors actual income.  As the Court found above, Debtors' actual income is $7,685.10.  The UST argues that, when using Debtors' actual income, Debtors have disposable income.  The UST argues that Debtors' Amended Schedule J has duplicate entries, which, when corrected for, reveal additional disposable income.  The UST also argues that Debtors' disposable income will increase in July 2017 when Debtors complete making $142.97 monthly payments on a 401(k) loan.

Debtors argue that they have no disposable income because of unforeseen expenses that the UST does not consider in its analysis.  Debtors argue that the UST's calculations do not reflect the contingencies of real life.  Debtors argue that braces for their children, school lunches, repairs to their home and vehicles, and

12

other expenses have prevented and continue to prevent them from having any disposable income.  Debtors argue that they have no money left at the end of every month, leaving nothing to pay creditors.

The Court finds that Debtors' Amended Schedule J provides for these expenses and that Debtors do in fact have disposable income.

Mr. Gourley testified that his daughter's braces were not covered by the $225 a month set aside each month for medical expenses.  Mr. Gourley asserted that other out-of-pocket medical costs used up this $225 a month.  Mr. Gourley testified that Debtors have paid for her braces with disposable income.  During cross-examination, however, Mr. Gourley clarified that Debtors have been paying for her braces with their Flexible Spending Account, which is funded with deductions from Mrs. Gourley's income.  This is not a minor clarification.  It undercuts Mr. Gourley's assertion—that Debtors have been paying for their daughter's braces with disposable income—in its entirety.  The income that goes into Debtors' Flexible Spending Account is not counted as income available to pay expenses.  Along with taxes and other deductions, it is not included in Mrs. Gourley's take-home pay.  The expenses for braces are covered by the Flexible Spending Account deduction and do not reduce Debtors' available disposable income.

13

Mr. Gourley also testified that Debtors' son may need braces as well.  It appears from the record that the cost of Debtors' daughter's braces has ended or will end soon.  Mr. Gourley testified that, although expected in the future, there has not yet been any expense for their son's braces.  Debtors presented no evidence that the Flexible Spending Account would not cover the cost of their son's braces.  In fact, Mr. Gourley testified that the cost of his son's braces would be similar to the cost of his daughter's braces.  And Mr. Gourley testified that Debtors have been paying for her braces with their Flexible Spending Account.  The Court finds that, whatever future expense Debtors' may incur for their son's braces, this expense will be covered by the Flexible Spending Account deduction and will not reduce Debtors' available disposable income.

There are similar problems with Mr. Gourley's testimony that Debtors have expenses related to their children's school lunch program.  He did not specify how much the lunch program cost, but Debtors' exhibit indicates that the lunch program costs Debtors about $150 a month.  On Debtors' Amended Schedule J, there is a line item for $350 a month for Childcare/Education expenses.  Mr. Gourley asserted that this $350 did not cover the cost of the school lunch program but did not explain why that was so.  The Court is not persuaded by Mr. Gourley's testimony.  His testimony that the $350 a month was simply used for summer education and "other expenses for getting them prepared for school" is conclusory

14

and does not show the reasonableness of this monthly amount or how it was used up on other legitimate expenses.

Moreover, Debtors have a specific, separate expense line item for $700 a month for food and household supplies.  Debtors did not show how or why school lunch was not covered by this line item for food and household supplies. Moreover, to the extent it is used to pay for household supplies, it is supplemented by Debtors' $300 line item for miscellaneous expenses.  Mr. Gourley testified this $300 a month covered household supplies such as laundry detergent.  Mr. Gourley did not explain what else this $300 a month was used for or what else came out of the "household supplies" end of the $700 line item.  In short, according to Amended Schedule J and Mr. Gourley's testimony, Debtors have $1000 a month to cover food and household supplies.  Thus, food costs are already more than sufficiently provided for in Debtors' Amended Schedule J.  The Court specifically finds that the cost of school lunches is covered already in Amended Schedule J. Thus, it does not reduce Debtors' available disposable income.

Mr. Gourley also claimed that Debtors' suffered an unexpected expense when they had to replace a water heater in their home.  Mr. Gourley testified that replacing the water heater cost $1,108.  Debtors' Amended Schedule J already has a line item for $300 a month for "[h]ome maintenance, repair, and upkeep expenses."  Mr. Gourley did not explain what this $300 a month was used for or

why it does not sufficiently cover the water heater.  The Court is not persuaded that replacing the water heater was an additional, unexpected expense that was not provided for in Debtors' monthly budget.  They budgeted for that expense already.  This water heater expense does not reduce Debtors' available disposable income.

Mr. Gourley next claimed that Debtors have had, and will continue to have, expenses related to their vehicles.  He testified that both vehicles currently require repairs or will likely require repairs in the future.  On Debtors' Amended Schedule J, there is a $500 line item for transportation.  Mr. Gourley testified that this $500 does not help cover vehicle repairs.  Mr. Gourley testified that the $500 a month Debtors set aside for transportation expenses is used up entirely by fuel costs for his daily commute.  The Court is not persuaded by Mr. Gourley's testimony.

Mr. Gourley testified that he commutes 60 miles a day round trip.  Assuming he drives 20 days a month for a total of 1,200 miles a month, at 19 MPG his truck would use 63.2 gallons of gasoline per month.  Thus, in order to spend $500 a month on gasoline, gasoline would need to be $7.90 per gallon.  This is well over three times the cost of gasoline in Iowa.  The line item for $500 a month covers more than fuel.

Moreover, Mr. Gourley regularly travels to St. Louis, Chicago, and northern Wisconsin to service clients.  He is reimbursed $0.38 a mile for this travel, but asserts that this reimbursement only covers fuel cost.  This appears to be inaccurate

16

on its face.  His truck gets roughly 19 MPG.  At $0.38 a mile, Mr. Gourley is

reimbursed about $7.22 per gallon of gas.  Thus, given current gas prices, it is clear

that $0.38 per mile compensates him for fuel and much more.

The Court finds that the $500 monthly line item for "Transportation" leaves

over $300 per month for expenses such as vehicle repairs.  Debtors' vehicle repair

costs are thus not additional or unexpected and do not reduce Debtor's disposable

income.

Ms. Cline testified that Debtors' Amended Schedule J has duplicate entries.

She testified that the line items for life and health insurance were duplicates of

paycheck deductions.   This testimony went unrebutted.  After reviewing Debtors'

payment advices, the UST analysis, and Amended Schedule J, the Court finds that

the $37.20 line item for life insurance and the $307.00 line item for health

insurance are duplicates of paycheck deductions.  As a result, they represent

expenses that have already been accounted for and should not be included in

Debtors' expense schedule.  Debtors' expenses, as set forth on their Amended

Schedule J, total $7,390.57.  Removing these duplicate entries leaves $7,046.37.

Thus, Debtors' expenses properly total $7,046.37.  Debtors' actual monthly

income is $7,685.10.  Subtracting Debtors' expenses from their income leaves a

monthly disposable income of $638.73.

The UST also correctly points out that Debtors monthly disposable income will increase in July 2017 when Debtors complete making $142.97 monthly payments on a 401(k) loan.  The UST is correct in noting that this additional money would be available to fund a Chapter 13 plan.  Debtors presented no evidence to the contrary.  Thus, looking at available income alone, the Court finds that there is currently $638.73 per month available and that another $142.97 per month will become available in just over a year.

## II.    Camper Payment and Purchase of a Vehicle on the Eve of Bankruptcy Are Excessive Expenses

Courts also consider whether a debtor's budget is excessive.  In re Honkomp, 416 B.R. 647, 649–50 (Bankr. N.D. Iowa 2009).  The UST argues that Debtors' $266 monthly camper payment (and related $20 a month camper insurance payment) is unnecessary and unreasonable.  The UST argues that eliminating this expense further increases Debtors' disposable income.  Debtors argue that they reaffirmed the debt secured by the camper to maintain a good relationship with Dupaco Credit Union, their primary lender.  Debtors argue that they will need that Dupaco relationship to purchase new vehicles in the future.  Mr. Gourley also admitted he purchased a newer vehicle in the month before filing bankruptcy.

The Court finds that Debtors' camper debt and vehicle upgrade is evidence that they could pay creditors something without causing even a slight hardship.

18

This Court has discussed its position on such transactions in other cases. The Court has previously found that "debtors who wish to retain luxury goods rather than pay their legitimate creditors are not the type of honest but unfortunate debtor who should benefit from Chapter 7 relief." In re Corbin, No. BR 12-00315, 2012 WL 2888002, at *3 (Bankr. N.D. Iowa July 16, 2012).  Similarly, "when seeking bankruptcy relief, debtors may be expected to do some belt tightening, including, where necessary, foregoing the reaffirmation of those secured debts which are not reasonably necessary for the maintenance and support of the debtor and his family." In re Duffy, No. BR 11-00841, 2011 WL 4344564, at *4 (Bankr. N.D. Iowa Sept. 15, 2011).  The reasoning of these cases applies here.  Debtors' camper payment is such an unnecessary debt.

Mr. Gourley testified that the camper payment is necessary because Debtors' need to maintain a good relationship with Dupaco.  This testimony is unpersuasive. Debtors are unlikely to need a new vehicle given that they upgraded before bankruptcy.  Even if Debtors did need financing, there is no evidence that continuing this particular lending relationship justifies making a $286 a month payment on a luxury item.  Whatever Debtors' motivations, the camper is not a reasonable and necessary expense.  Moreover, Debtors decision to reaffirm this luxury debt, and to then seek a discharge of other debts without payment, evidences an abusive Chapter 7 filing.

19

Debtors' purchase of a new vehicle on the eve of bankruptcy falls in a similar category.  Mr. Gourley testified that the increased car payment from $300 to $485 a month for one car resulted from a late 2014 purchase of a 2010 Chevy Silverado to replace his 2004 Chevy Silverado.  Debtors filed their bankruptcy petition on January 22, 2015—shortly after that purchase.   Purchasing vehicles on the eve of bankruptcy may be evidence that debtors are attempting to get a "head start by filing for bankruptcy and not a fresh start."  In re McLaughlin, 305 B.R. 505, 509 (Bankr. W.D. Mo. 2004); see also In re Hornung, 425 B.R. 242, 249 (Bankr. M.D.N.C. 2010) ("The Court notes that by purchasing these vehicles, the Debtors reduced their monthly disposable income on the means test by $130.84, raising the specter of impermissible manipulation.").  The reasoning of these cases applies here.

Debtors' camper and camper insurance payments are unnecessary and unreasonable expenses.  Moreover, their decisions to reaffirm the camper and to upgrade to a newer pickup before filing are evidence of abuse under § 707(b)(3).

### III.    Belt-tightening and Reasonable and Necessary Expenses

The UST argues that some of Debtors' other expenses on Schedule J are also unreasonable and unnecessary.  In particular, the UST argues that Debtors' $350 line item for recreation and $300 for miscellaneous expenses are excessive.  The UST argues that a reasonable reduction in these items would make more

disposable income available to fund a Chapter 13 plan.  The UST argues that these

reductions are warranted as a part of the "belt-tightening" required of all debtors.

The UST argues that Debtors are attempting to maintain their comfortable lifestyle

and leave their creditors with the bill.

Debtors argue that these expenses are reasonable and necessary.  Mr.

Gourley testified that Debtors do in fact spend $350 a month on recreation and

$300 a month on miscellaneous expense such as laundry detergent.  Debtors'

attorney argued that Debtors rapidly accumulated a great deal of debt in the years

before bankruptcy and that they have tightened their belts by no longer

accumulating debt.

Ceasing to accumulate debt, by itself, is not the type of belt-tightening

envisioned by caselaw.  Debtors have substantial income and appear to be

accustomed to a comfortable lifestyle.  Mr. Gourley's testimony reflects this.  He

did not testify about any specific actions that Debtors have taken to reduce their

spending—he simply asserted that Debtors are keeping their finances "as tight as

possible."  Apart from that assertion, Mr. Gourley's testimony was entirely about

how Debtors have spent everything they make—not about how they have cut back

on their spending—since filing bankruptcy.  A Chapter 7 discharge in this case

would allow Debtors to let the bill for their excessive spending fall to their

creditors.

21

Debtors' **Amended** Schedule J itself demonstrates this point. It was filed in response to the UST's Motion to Dismiss for Abuse. It upped the monthly line items from $80 to $350 for recreation and from $100 to $300 for miscellaneous expenses. These expenses and Mr. Gourley's testimony demonstrate that Debtors have not tightened their belts.

### IV.    Cause of Insolvency

The cause of a debtor's insolvency is also relevant when examining the totality of the circumstances. In re Honkomp, 416 B.R. 647, 649–50 (Bankr. N.D. Iowa 2009) (listing, among the factors a court should consider under § 707(b)(3), "whether the bankruptcy filing was precipitated by an unforseen catastrophic event, such as a sudden illness or unemployment").

Here, Debtors' filing was the result of overspending. Debtors lived well beyond their means and, in so doing, accumulated over $58,000 in unsecured debt. Debtors filed bankruptcy because of this overspending. There is no evidence of unique hardships or circumstances outside of Debtors' control that caused Debtors to accumulate this debt. In fact, there is evidence that Debtors have had a comfortable income for many years. The Court will not allow Debtors "to pass onto their creditors the costs incurred for the purchase of unnecessary goods and services." In re McClellan, 428 B.R. 737, 744 (Bankr. N.D. Ohio 2009).

Debtors' current disposable income of $638.73, plus the camper costs of $286, would result in disposable income of at least $924.73. After reasonable reductions to Debtors' recreation and miscellaneous expenses, Debtors disposable income would be well over $1000 a month. Moreover, after paying off the 401(k) loan, this amount will increase by another $142.97. Debtors have a substantial ability to pay. The Court concludes that the totality of the circumstances of Debtors' financial situation—their strong ability to pay, reaffirmation of the camper, purchase of a vehicle on the eve of bankruptcy, lack of belt-tightening, and overspending as the cause of their insolvency— demonstrates that Chapter 7 relief would constitute an abuse under 11 U.S.C. § 707(b)(3).

## CONCLUSION

**WHEREFORE**, the United States Trustee's Motion to Dismiss for Abuse is GRANTED. This Order will become final unless Debtors file a motion to convert to Chapter 13 on or before April 25, 2016.

Dated and Entered:
April 4, 2016

_____

THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE